WRENNE *et al. v.* AMERICAN NAT. BANK *et al.*

(*Nashville*, December Term, 1945.)

Opinion filed January 5, 1946.

W. ·P. Cooper, of Nashville, for Mrs. Wrenne.

Bass, Berry & Sims, of Nashville, for American Nat. Bank.

Mr. Justice Gailor delivered the opinion of the Court.

This appeal presents a contest between the bank as creditor of D. P. Wrenne, deceased, and his widow, who with others, filed the bill to wind up the estate as insolvent and assert her right to homestead and dower. The chancellor decreed that she should be allowed dower and homestead, and the bank appealed. The Court of Appeals reversed and the widow filed petition for *certiorari*, which we granted and on which we have heard argument.

D. P. Wrenne died on August 6, 1928, survived by his widow, Fannie T. Wrenne, his two children by her, and his five children by his first marriage. He left a will disposing of all of his estate and naming his widow, Fannie R. Wrenne, and his eldest son, D. P. Wrenne, Jr., as executors without bond, and he named his executors and his son Thomas W. Wrenne, trustees under the will. The will was probated and the executors qualified on August 13, 1928.

At the time of his death, the deceased owned all but three shares of stock in the banking corporation of Thomas W. Wrenne & Company. It was then very valuable, and some time during the year after D. P. Wrenne's death, an offer of $250,000 for this stock was refused. He also owned a fire insurance business which was conducted at his bank under the name of D. P. Wrenne & Company, some stock in the Nashville Gas Company, and other miscellaneous personalty. The chancellor found that at the time of the death of D. P. Wrenne the assets of his estate were $120,267.35, and his debts somewhat more than $46,000.

On November 21, 1928, the executors filed an inventory in the county court, alleging the par value of the stock

in Thomas W. Wrenne & Company at $24,700, the value of the insurance business of D. P. Wrenne & Company at $9,559.91, the value of the stock in the Nashville Gas Company at $2,750. The cash on hand was $359.44, and the stock of the General Trading Company $500. The assessed value of the real estate, including the home place, was $19,700. After filing the inventory, the executors took no further steps and filed no other papers in the county court to show their administration of the estate. Their further conduct of the estate was without any court sanction, whatever.

The principal debts of D. P. Wrenne at the time of his death were—a note to his bank of about $12,275, a note to the Fourth & First National Bank of $23,000, a mortgage on one parcel of real estate of $1,500, and a note due Thomas W. Wrenne & Company of some $9,000.

By consent of all parties, executors, beneficiaries and creditors, the banking business and the insurance business were not liquidated but were continued in operation after D. P. Wrenne's death. As a result of the operation of the business all of the debts were paid except the debt of Thomas W. Wrenne & Company and a balance of $11,500 to the Fourth & First National Bank. This indebtedness was evidenced by a note which was acquired in 1930 by the American National Bank, and secured by stock in Thomas W. Wrenne & Company. Annual dividends for as much as $12,000 per year were declared from the operation of Thomas W. Wrenne & Company, and the Nashville Gas Company stock was sold for $5,000. The executors make no accounting for these amounts.

After the bank holiday in 1933, the banking corporation of Thomas W. Wrenne & Company was unable to resume business. It was taken in charge by the superintendent

of banks for liquidation. All assets of the bank were used to pay creditors and nothing was left for the stockholders. The balance of the note of D. P. Wrenne to Thomas W. Wrenne & Company was taken over by the superintendent of banks as one of the assets of the corporation, but is long since barred by the statute of limitations. In April 1934, after the failure of Thomas W. Wrenne & Company, the American National Bank sued the executors on the balance of the note it held against them in the sum of $11,500. From the death of Wrenne, the Fourth & First National Bank, and later its transferee, the American National Bank, had been renewing this note and accepting small reductions of principal and the payment of current interest. There is no doubt but that the bank was thoroughly familiar with all the details of the situation, and of the fact that no final settlement of the estate had been made. The renewal notes on the indebtedness were taken as an obligation of the estate and signed by the executors. Apparently the shares of stock which were held by the bank as collateral were never transferred on the company's books after the death of Wrenne, and remained as they had been originally issued and endorsed by him.

The executors met the suit of the bank on the balance of the indebtedness by a plea of the statute of limitations. The chancellor overruled the plea on the ground that the delay had been at the special request of the executors for delay of a definite time and that, therefore, the delay should not be charged against the bank in applying the statute of limitations. He rendered judgment against the executors for $14,739.58 and on appeal, his decree was affirmed by the Court of Appeals and certiorari denied by this Court on June 11, 1938.

After this adverse decree became final, Fannie T. Wrenne, as widow and as executor; D. P. Wrenne, Jr., both individually and as executor, and the other children of D. P. Wrenne filed the original bill in this cause against the American National Bank to have the estate administered as an insolvent estate; to have the widow's homestead and dower set apart to her out of the real estate; to obtain subrogation against the real estate for her year's support; for reimbursement for taxes and insurance; and for all exempt personal property. The American National Bank filed an answer and crossbill denying her right to this relief and seeking an accounting by the executors and the sale of the land to pay its debt. The chancellor denied all other relief in the original bill, but granted the widow's prayer for homestead and dower, and dismissed the crossbill.

From so much of the decree as was adverse, the American National Bank perfected an appeal to the Court of Appeals and that court reversed the chancellor and denied the widow's right to dower and homestead. We granted *certiorari* and have heard argument.

It is unnecessary to copy the assignments of error presented by the petition for *certiorari*, at length. Alleging that there was a concurrent finding of fact by the master and the chancellor that the whole of the personal estate of D. P. Wrenne had been exhausted in the payment of his debts, it is insisted that the widow is entitled to dower and homestead under Code, section 8358 (2), and the Court of Appeals erred in holding that the burden of proof was on the widow to show that the whole of the estate had been so exhausted; that this was error because no such question had been raised by the bank, appellant, and because the concurrence foreclosed the question in the Court of Appeals.

We have carefully examined the master's report and he did not find that the whole of the estate had been exhausted in the payment of debts:

"As to what other assets came or by due diligence should have come into the hands of the executors I report that certain additional assets came into the hands of the executors by reason of their operation of. the business of the deceased from the date of his death until its closing on March 8, 1933. It appears that certain dividends were declared and the testimony is that they were applied on the debts of the deceased, including the debt due defendant American National Bank.

"I am unable to report the amount of such assets for the reason that the executors filed no further report in the County Court, after the inventory, and they now have no records as to the operation of said business and administration of the estate . . . *There is no clear showing as to what debts have been paid by the Executors, or to whom paid, etc.*" (Italics ours.)

The Master made no recommendation with regard to the payment of a year's support and exempt personalty or the setting apart of homestead and dower. On this subject, all that is said in his report is: "Year's support, exempt personalty, homestead and dower have not been duly set apart for the widow."

Coming next to the chancellor's decree, he confirmed the report of the clerk and master. However, he found that at the time of the death of D. P. Wrenne the estate was "amply solvent." That the debts then amounted to somewhat more than $46,000 and that the assets were $120,267.35. Then, after reciting the fact that the executors operated the business until the bank holiday of 1933, and the failure of Thomas W. Wrenne & Company, the chancellor summarizes the steps of the first litigation

between the bank and the executors and the final denial of the executors' plea of the statute of limitations. He then says: "Thus it was not until the conclusion of the above litigation in June, 1938, that the widow knew that the whole of the husband's property, including the bequest, would be taken for the payment of debts."

Then, after considering certain authorities which we will consider hereafter, the chancellor awarded the widow her dower under the authority of subsection (2) of section 8358 of the Code. Thus it seems clear to us that there was no such concurrence of fact as precluded the consideration of the chancellor's decree in all its aspects by the Court of Appeals. The trial having been according to the forms of chancery, this was a broad appeal and to be considered accordingly. Gibson's Suits in Chy., section 1263a. The chancellor held, in effect, that because the estate was insolvent in 1938, that the whole of the estate had been taken for the payment of the debts of the deceased. We think this was error because the determinative date was not 1938, but was six months after the qualification of the executors on August 13, 1928 (this administration was under the law as it existed prior to the passage of Chapter 175, Public Acts of 1939).

"Executors and administers shall have six months from the date of their qualification *to ascertain the situation of the deceased's estate,* and to arrange and settle it without being liable to suit and costs . . ." (Italics ours.) Code, section 8220.

We think that Code section 8358 (2) is to be read in connection with section 8220, and that both apply to the administration of estates under normal or usual conditions. If, on account of litigation or the settlement of complicated claims, additional time was required by the executors "to ascertain the situation of the deceased's

estate" with regard to solvency or insolvency, it is no doubt within the discretion of the county court to grant an extension, but we have no such situation on the facts of this case. It is admitted by all that six months after the qualification of the executors, or indeed at the expiration of the period of limitation for the filing of suit on claims against the estate, the assets were ample for the payment of debts.

Further, we think it clear on this record, that the estate was not exhausted by the payment of debts, since such payments of debts, as were made by the executors, were made out of profits from the operation of the business. All agree that no liquidation was made by the executors and that by an unfortunate and unforeseen national financial crisis which arose during the operation of the business by the executors, the estate was lost.

 The law required the executors in accepting their trust, to take certain definite steps for the settlement of the estate, and the law was written with those steps in mind. When the executors, however innocently, disregarded their duty under the law, as well as the clear mandate of the will, "that just debts be paid," they did so at their peril. Where the will directs that debts be paid, the executors at their peril continue to operate the business of the deceased, *Morrow* v. *Morrow*, 2 Tenn. Ch.. Rep., 549, 559; and such operation is a breach of trust where, as here, not expressly authorized by the will or by order of court (21 Am. Jur. 518, sec. 255; Compare *Warren* v. *Union Bank*, 157 N. Y. 259, 51 N. E. 1036, 43 L; R. A. 256, 68 Am. St. Rep. 777), even though the executors act with the utmost good faith. 21 Am. Jur. 519; *Swaine* v. *Hemphill*, 165 Mich. 561, 131 N. W. 68, 40 L. R. A. (N. S.) 201; *Martin Bros. Co.* v. *Peterson*, 38 S. D. 494, 162 N. W. 154. The widow, one of the executors,

was a woman experienced in business, and a former employee of Thomas W. Wrenne & Company, who was thoroughly familiar with its affairs. Under the facts here, we do not imply that she rendered herself personally liable by her actions as one of the executors.

 Further, we think as a matter of law that the chancellor was in error in applying subsection (2) of section 8358 of the Code. After the death of her husband in 1928, the widow entered upon and took the benefits of all that was given her under her husband's will. She made no attempt to dissent formally or informally until ten years after his death.

". . . *if the widow fails to dissent within the time allowed by law, it will be presumed conclusively that the provisions are satisfactory to her,* and she having thus, by failure to dissent from the will, elected to take under it, can not be allowed to share in the estate of which her husband died intestate, and can only receive the property given to her by the will." (Italics ours.) *Waterbury* v. *Netherland*, 53 Tenn. 512, 521. Approved in *McGinnis* v. *Chambers*, 156 Tenn. 404, 408, 1 S. W. (2d) 1015, 82 A. L. R. 1492.

This has been the law in Tennessee from very early times, as is evident from many reported cases. For example: *Malone* v. *Majors*, 27 Tenn. 577; *Crockett et al.* v. *Parkison*, 43 Tenn. 219; *Waddle et al.* v. *Terry et al.*, 44 Tenn. 51; *Walker* v. *Bobbitt*, 114 Tenn. 700, 88 S. W. 327; *Battle et al.* v. *Claiborne*, 133 Tenn. 286, 180 S. W. 584.

Since, therefore, under these authorities, the widow *must be conclusively presumed* to have assented to and taken under the will, and since we hold that the date of which the solvency of the estate was to be determined, was within six months from August 13, 1928, or at most,

within the period of limitation fixed for filing suit on claims against the estate (at which time the estate was amply slovent), it follows that Code, section 8358 has no application here and the cases construing that section are equally inapplicable.

■ The award of homestead is different from that of dower and in no way conditioned on the widow's election to take or not to take under the will. It is guaranteed to her as head of the family, under Article XI, section 11, of the Constitution (*Chamness* v. *Parrish,* 118 Tenn. 739, 747, 103 S. W. 822; *Carey* v. *Carey,* 163 Tenn. 486, 492, 43 S. W. (2d) 498), and is independent of the benefits she may have had under the will. The question of the solvency of the estate is immaterial. *Rowlett* v. *Rowlett,* 116 Tenn. 458, 95 S. W. 821.

In so far as the decree of the Court of Appeals disallowed the claim for dower, it is affirmed; and in so far as it disallowed the claim for homestead, it is reversed. The cause is remanded to the chancery court for further proceedings consistent with this opinion, and the parties will divide the costs.